UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BLACK COWBOYS, LLC, GREGORY L. WILSON, LATISHA HAYES, and GIRRARD EDISON, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | 1:05-cv-0553-JDT-WTL |
| STATE OF INDIANA DEPARTMENT OF NATURAL RESOURCES; JOHN GOSS, Individually and in His Official Capacity as Director of the Department of Natural Resources; GARY MILLER, Individually and in His Official Capacity as Assistant Director of the Department of Natural Resources, Division of State Parks & Reservations Inn and Concessions; DOUG WICKERSHAM, Individually and in His Official Capacity as Property Manager Fort Harrison State Park, Division of State Parks & Reservations, Department of Natural Resources; LIZ DUNN, Individually and in Her Official Capacity as Business Administrator, Division of State Parks & Reservations, Department of Natural Resources; THERESA MARSHALL, Individually and in her Official Capacity as Concession Inspector, Division of State Parks & Reservations, Department of Natural Resources; and JERRY JACKSON, Individually and in his Official Capacity as Conservation Office for Indiana Department of Natural Resources, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 43) AND PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT (Doc. No. 56)[1]**

---

[1] This Entry is a matter of public record and will be made available on the court's web site. However, the discussion contained herein is not sufficiently novel to justify commercial publication.

This case comes before the court on Defendants' Motion for Summary Judgment and Plaintiffs' Cross-Motion for Summary Judgment.  Plaintiffs are a limited liability company called Black Cowboys and their three shareholders.[2]  On March 17, 2005, they filed suit in state court against the State of Indiana Department of Natural Resources ("DNR") and several employees of the DNR on various federal claims and a state breach of contract claim.

The facts of this suit revolve around a saddlebarn concession at the Fort Harrison State Park ("Fort Harrison").  DNR terminated Black Cowboys' concession before the end of the license period.  Black Cowboys assert a 42 U.S.C. § 1983 claim against Defendants alleging that their concession was terminated because of their race in violation of the Equal Protection Clause.  All three of Black Cowboys' shareholders are African-Americans.  They further allege that their right to contract was violated under 42 U.S.C. § 1981.  Additionally, they claim the termination of their license was a violation of due process because they did not receive notice before their termination.  Finally, they allege that the termination of the license was a breach of the license agreement itself.

---

[2]  The court will refer to the Plaintiffs collectively throughout this entry as "Black Cowboys."  The parties never assert that a distinction between the individual and corporate Plaintiffs is meaningful as it relates to the motions before the court.

On April 15, 2005, Defendants removed the case to federal court.  They filed a motion for summary judgment on May 16, 2006.  Black Cowboys filed a response and its own motion for summary judgment on the breach of contract claim on August 4, 2006.  Defendants filed a reply on August 22, 2006, and a response to Black Cowboys' motion on September 6, 2006.  Black Cowboys filed a reply and surreply on September 27, 2006.  The motion is now ripe for consideration and the court rules as follows:

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Baron v. City of Highland Park*, 195 F.3d 333, 337-38 (7th Cir. 1999).  On cross-motions for summary judgment, each movant must individually satisfy the requirements of Rule 56, *ITT Indus. Credit Co. v. D.S. Am., Inc.*, 674 F. Supp. 1330, 1331 (N.D. Ill.1987), and the traditional rules for summary judgment apply even though both parties have moved for summary judgment. *Blum v. Fisher & Fisher*, 961 F. Supp. 1218, 1222 (N.D. Ill. 1997).

Defendants move for summary judgment on all claims; Plaintiffs move for summary judgment only on the breach of contract claim.  For the purpose of clarity and in light of the well-established standard for summary judgment, all the facts set forth in this Entry, unless noted otherwise, are taken in a light most favorable to Plaintiffs as the non-moving party on Defendants' motion.  Where the court needs to address the facts in a light most favorable to the Defendants, as the non-movant on Plaintiffs' cross-motion, the court will so note.

## II.    FACTS

On April 2, 2004, Plaintiff Black Cowboys began a license with DNR for the saddlebarn concession at Fort Harrison State Park on the east side of Indianapolis, Indiana.  Black Cowboys was formed by Plaintiffs Gregory Wilson and Girrard Edison, and, along with Plaintiff Latisha Hayes, are the only shareholders of Black Cowboys.  All three shareholders are African-Americans.  The license included the right for Black Cowboys to keep saddle horses at the park's saddlebarn for lessons and trail rides.  It could offer hayrides, a day camp, and special theme events.  Black Cowboys was also allowed to operate a gift shop and vending machines on the site.  The agreement called for an annual license fee of $7500 with Black Cowboys keeping all gross income.

During the period of Black Cowboy's license, Defendant Liz Dunn was a business administrator and saddlebarn inspector with DNR.  This job required making site visits to the state park saddlebarn concessions around Indiana and inspecting the condition of the horses and premises at the saddlebarns.  Dunn made many visits to Fort Harrison

during the summer and fall of 2004.  According to Plaintiffs, Dunn's trips were frequent
and disruptive.  While Dunn visited other concessions about once per month, Dunn
would visit Fort Harrison more often.  But it is not clear how often from Plaintiffs'
evidence.  While Wilson claims it was two or three times a week (Wilson Dep. 40-41),
Edison claims more conservatively that it was one to two times every two weeks
(Edison Dep. 17).  Regardless, they claim that it was disruptive because she would
watch the Plaintiffs' operations for hours and pop up unexpectedly on the trails and
scare the horses.  Wilson complained to Gary Miller, Assistant Director of DNR, about
Dunn's behavior, but nothing came of it.

Dunn made written reports of many of these visits.  Although Wilson requested
copies of these reports, he never received them while the license was still in effect.  A
summary of these written reports is provided and it is taken as true to the extent its facts
are uncontested by Plaintiffs.  Evidence provided by Plaintiffs to rebut Dunn's reported
version of the events is noted.[3]

Dunn visited on June 21, 2004, and wrote that she noticed several horses were
underweight.  She expressed concern in her memo that it would be difficult for the
horses to gain weight as work increased.  She noted that "the operator" did not share
her concern; "he instead feels all the animals look great."  (Dunn Dep. Ex. 24.)

---

[3] The narrative provided by Dunn in her reports is her version of events and a trier of fact
could choose to believe that her contemporaneous reports are less trustworthy than
Defendants' recollections where they differ.  However, it is relevant to show that her version of
events has remained constant.  Further, much of Dunn's version has remained unchallenged by
Defendants.

Dunn next wrote a memorandum on an informal visit July 5, 2004.  On this visit, she took her two daughters and two of their friends to ride the trail to check on some complaints that Black Cowboys was using lame horses.  All of the girls, ages fifteen to eighteen, had experience riding horses.  Dunn again noted that horses were underweight and that she could see ribs and hipbones.  She further noted a horse with a deep saddle sore and another with bloody legs from fly bites.  Dunn reported the girls' experience:  "They said the lead horse was indeed lame, and was kicked and hit repeatedly by the wrangler as it did not want to go forward.  Another horse ridden by one of the girls was decidedly sore, bobbing its head at the trot, a third horse was very stiff behind."  (Dunn Dep. Ex. 28.)  She ended the report: "Obviously, I need to return for further observation."  (*Id.*)

Dunn again visited Fort Harrison on July 26, 2004.  One of the horses had given birth the night before but had not been cleaned.  She was attracting flies, but Dunn noted she was otherwise fine.  She still noted that several horses looked thin and that she could see their ribs and hipbones.  She said that she did not discuss any of these observations with Wilson at the time "as he appeared to be busy."  (Dunn Dep. Ex. 26.)  Although she claims that she did express her concerns about thin horses on a visit

September 2, 2004, Wilson does not remember this.[4]  Dunn wrote: "Overall, I still feel there are quite a few thin horses at this stable." (Dunn Dep. Ex. 27.)

On October 5, 2004, Dunn was prompted to visit the park again because of five separate complaints.  Dunn explained to Wilson that people "had voiced concern about thin horses and lack of visible food in the pastures or hitching area." (Dunn Dep. Ex. 28, at 1.)  Wilson took Dunn to see a horse whose weight she claims she had previously complained about.  Dunn reports the horse "had protruding hips, prominent backbone vertebrae and withers, and his ribs showed." (*Id.*)  Wilson said that "it wasn't so much that he was *thin* but that he had poor *weight distribution.*" (*Id.* (emphasis in original); *see also* Wilson Dep. 81-82.)  Dunn "thought he looked terrible." (*Id.*)

Also on this visit, Wilson showed Dunn a barn where sick or quarantined horses were kept.  Dunn saw a horse with fistulous withers, a condition she believed requires veterinary care.  Wilson claimed he was treating the horse with antibiotics and "that was all that could be done." (*Id.*)  Another horse had severe saddle sores with draining pus

---

[4]  Although Wilson does not remember this particular exchange, no reasonable jury could believe that Dunn was *lying* about it.  According to Dunn's report, she specifically asked about three horses.  She claims Wilson explained that one was new and receiving extra rations and the other two had access to hay all day.  She also asked why horses in a particular area did not have anything to eat.  Wilson explained that they were only in that area part of the day and that they would have access to hay all night. (Dunn Dep. Ex. 27.)  On the other hand, Wilson testified in his deposition that he only remembers one incident (reported in the next textual paragraph) where Dunn asked about the weight of the horses.  It borders on incredible that Dunn would make up this elaborate exchange along with Wilson's rationalizations from nothing and put it in a contemporaneous report.  It crosses the line to where no reasonable jury could believe Dunn was lying when one considers that a very similar exchange between Dunn and Wilson the next month about the weight of some horses is corroborated by Wilson. (*See* Wilson Dep. 81-82; Dunn Dep. Ex. 28, at 1.)  Further, Wilson never claims that this exchange did not take place.  He testified that to his recollection the only exchange about any horse's weight is the one he corroborated. (Wilson Dep. 82.)

and scabs.  When confronted, Wilson claimed "the wound wasn't bad at all; it was just a sore.  When pressed, he admitted they had some poor saddles and they would replace them next year."  (*Id.* at 2.)

Dunn did a follow up visit the next week on October 13.  Dunn noted that "almost all the horses had some saddle sores and rubs."  (*Id.*)  She attempted to follow up on the horse with fistulous withers.  Wilson informed her that he had decided to get rid of the horse because it was not responding to treatment and was becoming too expensive. He presented Dunn with documents showing that the horse had been seen by a veterinarian.  Dunn ended the report: "I feel the quality of this operation with regards to safety, customer service and animal care is not what it should be."  (*Id.*)

Dunn visited the saddlebarn on November 18 again in response to a complaint. This time she received a complaint from someone who seen some of the horses from the saddlebarn auctioned off.  Dunn wrote that the complainant said: "The two animals were in very poor condition, and she found it alarming that they would have come from a state park operation."  (Dunn Dep. Ex. 29.)  No one was at the saddlebarn when she arrived, so she checked the horses and noted their condition.  According to Dunn, of the thirty horses at the property, twelve were underweight.

On December 28, 2004, Dunn received a complaint from Shirley Smith of the Indiana Hooved Animal Society.  Smith was in turn relaying a complaint from a Katie Getz, who claimed that the horses at Fort Harrison were being abused and neglected. Smith had also contacted the City of Lawrence Police Department.  Dunn contacted

both Katie Getz and the Lawrence Police Department to discuss the complaint and then went to Fort Harrison on December 29.  After inspecting the horses, Dunn requested a veterinarian come to Fort Harrison.

A veterinarian, Dr. David Pierson, and his assistant arrived that afternoon.  Dr. Pierson wrote his conclusions in a report the next day and submitted it to Dunn.  The report stated that "[a]ll except for two of the horses and three of the ponies were in poor body condition."  (Pierson Decl. Ex. A.)  Pierson also noted that most of the horses had fungal skin infections.  He wrote there was not enough bedding in the stalls and what was there was wet.  He claimed many water buckets were empty and that some horses were eating their bedding because there was no hay or grain in the stalls.  Dr. Pierson specifically noted the condition of six animals in the barn and two in a paddock.  Dr. Pierson provided body scores on the Henneke scale of 1 to 9 (9 being fat and 1 being emaciated).  One horse received a score of 1, three received scores of 1.5, one received a 2, and one received a 2.5.  Of the horses in the paddock, one was lame on both front legs and the other had a large wound with pus under a bandage.  In Dr. Pierson's opinion, "these horses are nutritionally neglected and should be removed from the care of the current owner(s) as soon as possible so that appropriate nutrition, deworming, and other necessary medical treatments can be provided."  (*Id.*)[5]

---

[5]  Although Plaintiffs dispute the thoroughness of the exam and the conclusions of the report, it is undisputed that Dunn was present while Dr. Pierson's exam was being conducted and received a copy of the written report (albeit after the termination).

The next day, Dunn went back to Fort Harrison with Jerald Jackson, a DNR Conservation Officer.  They inspected the horses and then called Jerry Pagac, Director of Indiana State Parks and Reservoirs, to determine how to proceed.  Dunn recommended terminating Black Cowboys's concession.  Pagac agreed.  Dunn presented a letter of termination to Wilson that day which mentioned as the reason for termination the abuse of the horses with the letter claiming the charge had been verified by a veterinarian.  (Defs.' Ex. 16.)  The letter informed Black Cowboys that it had seven days to leave the premises and that Black Cowboys could not remove the horses.  (*Id.*)

The Indiana State Police and City of Lawrence Police arrived at Fort Harrison. The State Police said they would seize the horses and turn them over to DNR if there was "reasonable cause."  (Dunn Dep. Ex. 32.)  Dr. Carol Habig, a veterinarian, was called and arrived at Fort Harrison later that day.  Dr. Habig could not determine abuse or neglect just from her observations that day;[6] therefore, the animals were not seized. In a reversal of DNR's initial position that Black Cowboys could not remove any horses, Black Cowboys were instructed to remove the horses in accordance with the contract. This was done the next day, on December 31.  Tim Hollars, who is white, replaced Black Cowboys in the Fort Harrison Saddlebarn Concession.

---

[6] But Dr. Habig was able to determine that fifteen of the eighteen horses at the saddlebarn were underweight.  (Habig Decl. Ex. B.)  Black Cowboys also had a veterinarian of their own, Dr. Hughes, examine the animals alongside Dr. Habig.  In their brief, Black Cowboys assert that Dr. Hughes believes that the horses were "compatible with highly worked trail-horses being winterized."  (Pls.' Reponse Summ. J. 19.)  However, the report is not in the record, nor have Plaintiffs submitted a deposition or affidavit of Dr. Hughes.  There is no evidence in the record to support the assertion; therefore, it cannot be considered.

III.    **DISCUSSION**

Plaintiffs' amended complaint detailed nine counts against Defendants, five of which Plaintiffs abandoned in their response to Defendants' motion for summary judgment.  (Pls.' Br. Resp. Summ. J. 1.)  The four remaining claims are: (1) breach of contract; (2) 42 U.S.C. § 1983 for a violation of the equal protection clause; (3) 42 U.S.C. § 1981; and (4) 42 U.S.C. § 1983 for a violation of the due process clause.  The section § 1981 and § 1983 claims may be treated together.  The Supreme Court has taught that § 1983's remedial scheme is the sole avenue for Plaintiffs alleging § 1981 claims against a state actor.  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989).  Therefore the court will analyze all of the Plaintiffs' federal § 1983 claims and then the state law breach of contract claim.

Before proceeding in detail on the various § 1983 claims and the breach of contract claim, the court notes that it can easily dismiss all Defendants with the exception of Liz Dunn on the § 1983 claims and the DNR on the breach of contract claim.  Under § 1983, liability must be based on a defendant's personal responsibility.  *Wellman v. Faulkner*, 715 F.2d 269, 275 (7th Cir. 1983).  There is no evidence in the record that John Goss, Gary Miller, Doug Wickersham, Teresa Marshall, or Jerry Jackson had anything to do with the decision to terminate the concession contract; therefore, they cannot be liable under § 1983.[7]  The breach of contract claim, of course,

---

[7]  Neither can DNR be liable under § 1983.  It seemed from their complaint that Plaintiffs were not asserting the § 1983 claims against DNR; however, in their Response Brief, Plaintiff argued that the claim may proceed against the DNR.  Supreme Court case law teaches this is

(continued...)

is only against the DNR.  Plaintiffs present no argument in their briefs as to why these individual defendants should remain either as individuals or in their official capacities. Therefore the court **DISMISSES** all the individual defendants except Liz Dunn.

### A.     42 U.S.C. § 1983 Claims

#### 1.     Procedural Due Process

Plaintiffs claim that Dunn deprived them of their procedural due process rights when their contract was terminated without the notice they believe was required under their contract.  They base their claim on the Fourteenth Amendment, which prohibits a state from depriving an individual "of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  Black Cowboys claims that it had a property interest in the saddlebarn concession.

Procedural due process claims like this involve a two-step analysis.  The first step determines whether there is a protected interest; the second determines what process is due.  *Townsend v. Vallas*, 256 F.3d 661, 673 (7th Cir. 2001).  Therefore, in order to get relief Plaintiffs must show that their concession contract created a property interest and that they did not get the process constitutionally due to them before it was terminated.

---

[7](...continued)
not the case; a state entity may not be sued under § 1983 because it is not a "person" for purposes of the statute.  *See Will v. Mich. Dept. of State Police*, 491 U.S. 58, 66 (1989).

But even if the license agreement created a protected property right, a breach of contract claim (like that pursued by Plaintiffs here) would give adequate process to Black Cowboys.  As the Seventh Circuit has taught:

> The question when contracts with a state agency create constitutional property is less momentous than might appear.  All states provide judicial remedies for breach of contract and these remedies will almost always provide all the process that is constitutionally due, making the question whether the contract right was also a property right academic.

*Ind. Land Co., LLC v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir. 2004).  So it is here.  The parties dispute the meaning of a commercial contract, and thus an opportunity to litigate the breach of contract claim is all the process due.  *See Mid-Am. Waste Sys., Inc. v. City of Gary, Ind.*, 49 F.3d 286, 291 (7th Cir. 1995).

Plaintiffs argue that this license agreement is more akin to an employment contract than a commercial agreement and thus a hearing before the termination was required.  *Bd. of Regents v. Roth*, 408 U.S. 564, 569-70 (1972); *Perry v. Sindermann*, 408 U.S. 593, 599 (1972).  They argue that in operating the saddlebarn, they were acting on behalf of the DNR.  Indeed, as the complaints DNR received about the saddlebarn indicate, at least some members of the public believed the horses were DNR property.

But the license agreement is easily distinguishable from an employment contract.  Black Cowboys is a corporation that bid on a saddlebarn concession presumably in the hopes of making money.  Black Cowboys may not be a large or sophisticated corporation and its motivations for bidding on the saddlebarn may have been about

-13-

more than maximizing profits.  However, this is an agreement between a corporation

and the state to engage in a business venture (albeit on public land and using some

public facilities) where the corporation keeps the gross income from the venture after

paying the state a percentage for the right to use the state's land and facilities.  To

characterize this as employment rather a commercial contract flies in the face of the

common understanding of both terms.  Black Cowboys will have an opportunity to

pursue their breach of contract claim, which is all the process that is due; therefore, their

procedural due process claim is **DENIED**.

### 2.       Equal Protection and § 1981

Plaintiffs' Equal Protection and § 1981 claims are analyzed identically under the

standard set for Title VII claims.  *See Humphries v. CBOCS, Inc.*, 474 F.3d 387, 403-04

(7th Cir. 2007) (§ 1981); *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003) (§

1983 equal protection).  Plaintiffs admit that they do not have direct evidence of

discrimination; therefore, they must proceed under the *McDonnell Douglas* burden-

shifting framework.[8]

Under this framework, Plaintiffs have met their prima facie case.  Defendant

argues that Plaintiff cannot show that there are similarly situated people that were

---

[8] The court assumes some familiarity with the *McDonnell Douglas* burden-shifting framework.  To summarize: Plaintiffs must first make a prima facie case of discrimination.  If they can, then the burden shifts to Defendants to proffer a legitimate, nondiscriminatory reason for the adverse action.  If Defendants cannot do this, Plaintiffs wins on summary judgment; if Defendants can, the burden shifts again to Plaintiffs to show that the proffered reason is merely a pretext for some ulterior motive. *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993).

treated more favorably.  However, the court finds a more relevant formulation of the

*McDonnell Douglas* prima facie case in *Randle v. LaSalle Telecommunications, Inc.*,

876 F.2d 563, 570-71 (7th Cir. 1989).  In that case the Seventh Circuit stated the four

requirements as:

> (1) that she was a member of the protected class, (2) that she was doing
> the work well enough to meet the employer's legitimate expectations [or
> her contractual obligations], (3) that, in spite of her performance, she was
> discharged, and (4) that her employer sought a replacement for her.

*Id.* (alteration in orginal).[9]  *Randle* was a § 1981 case where a company established by

an African-American woman sued a cable television franchise for which it had

contracted to do work.  That is a sufficiently analogous case to the one at hand to

convince the court that this formulation of the prima facie case is the appropriate one.

After all, there are very few saddlebarn concessions with which Plaintiffs can compare

themselves and the discreteness of the saddlebarns make finding whether a

replacement was sought fairly easy.

Taking the facts in a light most favorable to Plaintiffs, they meet all four of these

requirements.  There is no disagreement about the first and third.  And interestingly,

Defendants do not present an argument on the second prong either.  Regardless, a

---

[9]  Defendants argue that there is an additional requirement for a prima facie case under
the equal protection clause, namely that Dunn acted with discriminatory intent.  Indeed many
cases in the Seventh Circuit have listed this as a fifth element of a prima facie case under the
equal protection clause, including *McPhaul v. Board of Commissioners of Madison County*, 226
F.3d 558, 564 (7th Cir. 2000), a case cited by Plaintiffs for the proposition that the standard for
equal protection claims is identical to Title VII.  The Seventh Circuit has made it clear, however,
that "such an addition is really a redundancy" because intentional discrimination may be proven
through the burden-shifting method.  *Williams*, 342 F.3d at 788.

reasonable jury could choose to believe Black Cowboys that they were meeting the legitimate expectations of the DNR. After all, they had received no notice from DNR that their performance was deficient or needed to improve in order to keep the license. A jury could determine that Dr. Pierson was mistaken in his opinion that the horses were abused or neglected and that all of the other complaints against Black Cowboys were not serious enough to have warranted termination. Yet, Defendants do not argue that Plaintiffs have not met their burden on this prong. Instead, Defendants argue exclusively that Black Cowboys have not found a similarly situated concession that was treated more favorably. As the court has explained, it finds that formulation to be inapt for this situation.[10]

The burden next shifts to Defendants to proffer a nondiscriminatory reason for terminating the contract, which Defendants is able to do. Defendants claim that Black Cowboys's contract was terminated because of the abuse and neglect of horses. The burden then shifts to Plaintiffs to show that this reason is pretext. The analysis for pretext is "not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the

---

[10] However, Plaintiffs presented evidence of the Shakamak Park Saddlebarn Concession, which was run by the Roberts, a white couple. Plaintiffs claim that this was a concession where there were problems with horses. For example, there was a very thin horse, another horses did not have water, and the horses were kept in a paddock where they dug holes. DNR sent the Roberts two notices of concerns and contract violation. Finally, DNR gave the Roberts the option to terminate the contract without triggering the liquidation provision of the contract. Defendants argue that the Roberts are not similarly situated because what Dunn alleges Black Cowboys did is of a different magnitude from what the Roberts did. The court need not decide the issue because it believes Plaintiffs meet their prima facie case under a different formulation.

employer's action rather than being a pretext for some other, undisclosed reason."
*Forrester v. Rauland-Borg. Corp.*, 453 F.3d 416, 417 (7th Cir. 2006).

There is simply no evidence that Dunn did not honestly believe the horses were abused or neglected.  There are notes from several visits she made to Fort Harrison all commenting on the condition of the horses.  After Dunn received a complaint from the Hooved Animal Humane Society, she went with a veterinarian to Fort Harrison and the veterinarian reported that he believed that the animals were being neglected.  She went back the next day with a Conservation Officer.  This indicates that her claim that the horses were being neglected was honest and not fabricated for the purpose of concealing an ulterior motive.

Plaintiffs claim that there is evidence with which a trier of fact could determine that this was pretext.  First, Plaintiff points to the termination letter from Dunn and a later letter from the Office of the Commissioner of the Department of Administration.  After receiving the termination letter from Dunn, Black Cowboys sent a letter of protest to the Commissioner which was answered on the Commissioner's behalf by a staff member.  The Commissioner agreed that the contract had been properly terminated.  In her letter, Dunn mentioned Section D, pt. 17 of the license agreement as the basis for the termination.[11]  The Commissioner, by contrast, mentioned both Section D, pt. 17 and

_____

[11]  The relevant portion of Section D, pt. 17 provides:

Abuse and/or neglect of animals is a violation of law and is considered to be a severe violation of this agreement, which may result in termination of the agreement in addition to other remedies available to the Department.

(continued...)

-17-

Section T, pt. 6.[12]  Plaintiffs claim that this "added explanation" is evidence that the

reason for the termination was pretextual.  Plaintiffs also point out that the

Commissioner used Dr. Habig's report as evidence in the January 20 letter despite the

fact that Dunn did not have a copy of Habig's report at the time she made her decision.

Plaintiffs cite *Emmel v. Coca-Cola Bottling Co.*, 95 F.3d 627 (7th Cir. 1996).  In

that case, the Seventh Circuit affirmed a judgment on a verdict against employer Coca-

Cola Bottling Co.  Coca-Cola had argued that it provided a nondiscriminatory reason for

not promoting plaintiff and that plaintiff could not prove pretext.  The court disagreed,

noting among other reasons that Coca-Cola had failed to give this reason until late in

the litigation.  At trial, Coca-Cola had claimed that its north and south zone

decisionmakers each had a different nondiscriminatory system for making promotion

decisions.  However, when the plaintiff had confronted her supervisor (who was also the

decisionmaker) at the time of the decision, he had not given this reason.  If the

purported nondiscriminatory reason had been the true reason, Emmel's supervisor

might have been expected to give it at the time.  Further, when asked in interrogatories

---

[11](...continued)
(Compl. Ex. A, at 7.)

[12]  The relevant portion of Section T, pt. 6 provides:

The department may, in cases where continued operation by the Licensee may
result in significant or irreparable harm to the Department and/ or the public,
terminate the License immediately.  Examples include, but are not limited to,
non-payment of fees, discourteousness to the public, insurance cancellation,
bond cancellation, alcohol abuse, and other circumstances which could cause
harm to the public or the Department or reflect adversely on the Department.

(Compl. Ex. A, at 16.)

why plaintiff was denied the promotions, Coca-Cola had stated that it felt that plaintiff had not sought promotion and therefore was not denied promotion.  Again, Coca-Cola had not taken an opportunity to present its nondiscriminatory reason when asked directly.  The Seventh Circuit believed that this was evidence that the jury could use to determine that the nondiscriminatory reason given in court was pretext.

This case is substantially different.  DNR and Dunn at all times claimed that they were terminating the contract because of the abuse and neglect of the horses.  The general counsel for the Commissioner of the Department of Administration gave the exact same reason.  That she, after a more thorough reading of the license agreement, was able to cite an additional passage from the contract that supported DNR's legal position in no way casts doubt on Dunn's belief at the time of the decision that the horses were being neglected or abused.  It is also to no avail that the Commissioner cited to Dr. Habig's report despite the fact that Dunn did not have it to rely on that day.  The fact that the Commissioner subsequently cited to *additional* evidence that Dunn was correct after her decision has nothing to do with Dunn's honest belief at the time.

Next, Plaintiffs claim that the fact that the horses were not seized when Dunn visited Fort Harrison to terminate the contract is evidence that Dunn did not honestly believe the horses were abused or neglected.  But this argument is unavailing.  The evidence shows that Dunn did everything in her power to seize the horses.  The fact that she was unsuccessful because of matters outside her control does not show that she did not honestly believe that the horses were being abused or neglected.

-19-

Plaintiffs also claim that Dunn would have given Plaintiffs a copy of her reports had she been legitimately concerned about the welfare of the horses.  It is not immediately clear how Dunn's failure to give Black Cowboys copies of her written memorandum would show that Dunn did not believe the horses were being abused or neglected when the license was terminated.  It might show that Dunn did not form this opinion until the day she took a veterinarian to Fort Harrison.  However, the evidence shows that Dunn moved quickly after a veterinarian told her that he believed the horses were being abused.  Further, it seems that Dunn brought up her concerns with Black Cowboys earlier in the season before the horses deteriorated.

If Plaintiffs are to be believed (as they must on Defendants' motion), Dunn was "stalking" them and coming out to the concession excessively.  But the quality or fairness of Dunn's investigation into the numerous complaints about Black Cowboys is beside the point.  *See Kariotis v. Navistar Int'l Transp. Co.*, 131 F.3d 672, 678 (7th Cir. 1997).  There is no evidence that her belief that horses were being abused was not Dunn's motivation for terminating the contract with Black Cowboys.  Thus, Black Cowboys cannot show pretext and the § 1981 and § 1983 equal protection claims against Dunn must be **DISMISSED**.

### B.    State Breach of Contract Claim

All of the Plaintiffs' federal law claims have been dismissed, leaving only Plaintiffs' state breach of contract claim against DNR.  "[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish

jurisdiction over pendant state-law claims rather than resolving them on the merits."
*Wright v. Associated Insurance Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994).  Plaintiffs have presented no reason why this general rule should not apply in this case, nor can the court see why judicial economy, convenience, fairness, or comity would not dictate remanding the breach of contract claim to state court.  Indeed, what remains is a run of the mill state breach of contract claim where the entire body is Indiana state law.  The Indiana state courts are better suited to proceed with this claim.  Therefore, the breach of contract claim will be **REMANDED** to state court.

The court notes two additional points.  First, Plaintiffs originally brought the case in state court.  The Defendants removed the case to federal court; now they ask for this claim to return to state court.  Plaintiffs provided no reason why their original choice is no longer acceptable.  Finally, this is a suit against the state.  Sovereign immunity as embodied by the Eleventh Amendment might have been used by the DNR to force the claim back to state court.  Although this court could ignore sovereign immunity because the state did not raise it with respect to this claim, it is not forced to do so.  *Higgins v. Mississippi*, 217 F.3d 951, 954 (7th Cir. 2000).  The reasons set forth in the previous paragraph are sufficient to justify remand, but were they not, sovereign immunity would also justify remand.

## IV.     CONCLUSION

Defendants' motion for summary judgment is **GRANTED** on all claims, except the state breach of contract claim.  Plaintiffs will now have an opportunity to litigate their

breach of contract claim against DNR in state court.  The state breach of contract claim

is **REMANDED**.

ALL OF WHICH IS ENTERED this 22nd day of March 2007.

_____

John Daniel Tinder, Judge
United States District Court

Copies to:

Magistrate Judge William T. Lawrence

Chad M. Buell
LAW OFFICES OF ST. PAUL TRAVELERS
cbuell@stpaultravelers.com

Andrew G. Jones
HASKIN LAUTER LARUE & GIBBONS
ajones@hlllaw.com

Denise K. LaRue
HASKIN LAUTER LARUE & GIBBONS
dlarue@hlllaw.com

Kathryn Lynn Morgan
INDIANA STATE ATTORNEY GENERAL
Kathryn.Morgan@atg.in.gov

Juliana B. Pierce
INDIANA STATE ATTORNEY GENERAL
Julie.Pierce@atg.in.gov